# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

No. 12-14600

---

D.C. Docket No. 8:08-cv-02446

---

TAMPA BAY WATER,
A Regional Water Supply Authority,

Plaintiff – Appellant,

vs.

HDR ENGINEERING, INC.,
a Nebraska corporation,

Defendant – Appellee.

---

Appeal from the United States District Court
for the Middle District of Florida

---

# BRIEF OF APPELLEE HDR ENGINEERING, INC.

---

Arthur J. England, Jr.
**ARTHUR ENGLAND LAW**
1825 Ponce de Leon Blvd.
Suite 512
Coral Gables, FL 33134
Telephone: (305) 967-8489
Email:
Arthur@arthurenglandlaw.com

Wayne B. Mason
S. Vance Wittie
**SEDGWICK LLP**
1717 Main Street, Suite 5400
Dallas, TX 75201-7367
Telephone: (469) 227-8200
Email:
wayne.mason@sedgwicklaw.com
vance.wittie@sedgwicklaw.com

Timothy D. Woodward
**FORIZS & DOGALI, P.A.**
4301 Anchor Plaza
Parkway
Suite 300
Tampa, FL 33634
Telephone: (813) 289-0700
Email:
twoodward@forizs-dogali.com

# CERTIFICATE OF INTERESTED PERSONS
## and
## CORPORATE DISCLOSURE STATEMENT

Appellee HDR Engineering, Inc. submits this Certificate of Interested Persons and Corporate Disclosure Statement pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1. Appellee identifies the following:

1. England, Arthur J., Jr.

2. HDR Architecture, Inc.

3. HDR BEST Plan & ESOP

4. HDR Constructors, Inc.

5. HDR Engineering, Inc.

6. HDR Environmental, Operations and Construction Inc.

7. HDR, Inc.

8. Mason, Wayne B.

9. Meaders, Kurt W.

10. Wittie, S. Vance

11. Woodward, Timothy D.

*s/ S. Vance Wittie*

**S. Vance Wittie**
Texas Bar No. 21832980
Wayne B. Mason
Texas Bar No. 13158950
Sedgwick LLP
1717 Main Street, Suite 5400
Dallas, TX 75201-7367
Telephone: (469) 227-8200
Email: vance.wittie@sedgwicklaw.com
Email: wayne.mason@sedgwicklaw.com

**Arthur J. England, Jr.**
Florida Bar No. 022730
1825 Ponce de Leon Boulevard #512
Coral Gables, FL 33134
Telephone: (305) 967-8489
Email: Arthur@arthurenglandlaw.com

**Timothy D. Woodward**
Florida Bar No. 0486868
Forizs & Dogali, P.A.
4301 Anchor Plaza Parkway, Ste. 300
Tampa, FL 33634
Telephone: (813) 289-0700
Email: twoodward@forizs-dogali.com

*Attorneys for Appellee*

# STATEMENT REGARDING ORAL ARGUMENT

HDR believes that oral argument is not necessary in this appeal. TBW failed to preserve any error for its challenge to the causation evidence that was raised by its Motion in Limine. Its *Daubert* challenge to the testimony of Dr. Bromwell addresses only a small portion of his multi-faceted opinion, and the District Court did not abuse its discretion in denying TBW's belated, prejudicial, and futile motion to amend its pleadings. Further, the issues presented by TBW fall squarely within the principles of the harmless error rule.

Even taking the merits into consideration, the issues TBW raises are matters reviewed under the abuse-of-discretion standard, and a simple consultation of the record should be sufficient to uphold the District Court's exercise of discretion in each case.

# TABLE OF CONTENTS

<u>Page</u>

CERTIFICATE OF INTERESTED PERSONS and CORPORATE
DISCLOSURE STATEMENT ................................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS................................................................ iv

TABLE OF CITATIONS ................................................................ vi

STATEMENT OF THE ISSUES........................................................ xii

STATEMENT OF THE FACTS ......................................................... 1

SUMMARY OF THE ARGUMENT ................................................... 10

ARGUMENT and CITATIONS OF AUTHORITY ............................................. 14

    I.    THE DISTRICT COURT CORRECTLY PERMITTED HDR
        TO PRESENT A CAUSATION DEFENSE.................................... 14
        A.    TBW Has Failed to Preserve Any Complaint to the
            Admission of Evidence .......................................... 14
        B.    The Summary Judgment Did Not Preclude HDR's
            Causation Defense................................................ 17
            1.    The Effect of the Judgment is a Matter of
                Federal Law ................................................ 17
            2.    Collateral Estoppel Does Not Preclude HDR's
                Causation Defense ...................................... 18
            3.    Judicial Estoppel Does Not Bar HDR's
                Causation Defense ...................................... 25
        C.    No Provision of Florida Law Precluded HDR's
            Causation Defense................................................ 28
            1.    Barnard Was Not Determined Faultless ........................ 28
            2.    A Defendant May Assert Alternative Causation
                Regardless of the Legal Status of the Alleged
                Causal Agent................................................ 30

iv

        3.      The Collapse-Upon-Wetting Theory Does Not
Depend On a Finding that Barnard was at Fault ...........33

II.     THE DISTRICT COURT CORRECTLY FULFILLED ITS
GATEKEEPER FUNCTION IN ADMITTING DR.
BROMWELL'S TESTIMONY ......................................................... 34

     A.     Standards Governing Expert Testimony...................................35

     B.     Dr. Bromwell's Methodology Met the *Daubert* Test
of Reliability ...............................................................................37

         1.      Dr. Bromwell's Opinion That the Cracking
Was Not Caused by Excess Pore Pressure Was
Amply Supported.................................................................38

         2.      Bromwell's Opinion That the Cracking Was
Caused by collapse upon wetting Was Amply
Supported.........................................................................40

     C.     Dr. Bromwell's Testimony Used Reliable
Extrapolation from the Law Testing Data ................................42

III.    THE DISTRICT COURT CORRECTLY DENIED LEAVE TO
AMEND TO RAISE A FUTILE IMPLIED COVENANT
CLAIM ...................................................................................... 47

     A.     The District Court Applied the Correct Standard .....................47

     B.     TBW Created Undue Prejudicial Delay....................................48

     C.     The Proposed Covenant of Good Faith Claim Was
Properly Regarded as Futile.....................................................48

IV.    TBW HAS NOT DEMONSTRATED HARMFUL ERROR ............ 51

CONCLUSION ........................................................................................54

CERTIFICATE OF COMPLIANCE.........................................................55

CERTIFICATE OF SERVICE .................................................................56

# TABLE OF CITATIONS

Page

## Cases

*Allen v. Dillon Transport, Inc.,*
  2003 WL 24889457 (M.D. Fla. Dec. 9, 2003)....................................................32

*Allied-Signal Inc. v. Fox,*
  623 So.2d 1180 (Fla. 1993)...................................................................................29

*Amcast Indus. Corp. v. Detrex Corp.,*
  45 F.3d 155 (7th Cir. 1995)..................................................................................20

*AmerisourceBergen Corp. v. Dialysist West, Inc.,*
  465 F.3d 946 (9th Cir. 2006)................................................................................47

*Arizona v. California,*
  460 U.S. 605, 103 S. Ct. 1382 (1983)..................................................................19

*Arlen House East Condo Ass'n v. QBE Ins. (Europe) Ltd.,*
  No. 07-23199-CIV, 2008 WL 4500690 (S.D. Fla. Sept. 30, 2008)....................50

*Beach St. Bikes, Inc. v. Bourgett's Bike Works, Inc.,*
  900 So.2d 697 (Fla. 5th DCA 2005) ...................................................................49

*Bell v. Swift & Co.,*
  283 F.2d 407 (5th Cir. 1960)................................................................................52

*Berry v. City of Detroit,*
  25 F.3d 1342 (6th Cir. 1994)................................................................................46

*Burnes v. Pemco Aeroplex, Inc.,*
  291 F.3d 1282 (11th Cir. 2002) ...........................................................................26

*Centurion Air Cargo, Inc. v. United Parcel Serv., Co.,*
  420 F.3d 1146 (11th Cir. 2005) ...........................................................................51

*Chomont v. Ward*,
    103 So.2d 635 (Fla. 1958)..................................................................33

*Christo v. Padgett*,
    223 F.3d 1324 (11th Cir. 2000) .......................................................18

*Citibank N.A. v. Data Lease Fin. Corp.*,
    904 F.2d 1498 (11th Cir. 1989) .......................................................17

*City of Tuscaloosa v. Harcros Chems. Inc.*,
    158 F.3d 548 (11th Cir. 1998) .................................................. 37, 44

*Clement v. Rousselle Corp.*,
    372 So.2d 1156 (Fla. 1st DCA 1978) ...............................................30

*Cowgill v. Raymark Indus.*,
    832 F.2d 798 (3d Cir. 1987)............................................................20

*Cox v. CSX Intermodal, Inc.*,
    732 So.2d 1092 (Fla. 1st DCA 1999) ...............................................51

*Crowell v. Kaufmann*,
    845 So.2d 325 (Fla. 2d DCA 2003) ..................................................28

*CSX Transp. Inc. v. Brotherhood of Maintenance of Way Employees*,
    327 F.3d 1309 (11th Cir. 2003) ................................................ 17, 25

*D'Angelo v. Fitzsmaurice*,
    863 So.2d 311 (Fla. 2003)...............................................................28

*Dalide v. U.S. Attorney General*,
    387 F.3d 1335 (11th Cir. 2004) .......................................................19

*Daubert v. Merrell-Dow Pharm., Inc.*,
    509 U.S. 579, 113 S. Ct. 2786 (1993).......................................... 36, 37

*Dosdourain v. Carsten*,
    624 So.2d 241 (Fla. 1993)..................................................................6

*Empire Fire & Marine Ins. Co. v. J. Transp.*,
    880 F.2d 1291 (11th Cir. 1989) .......................................................18

*Flagship Resort Dev. Corp. v. Interval Int'l Inc.*,
　　28 So.3d 915 (Fla. 3d DCA 2010) ........................................................49

*Frederick v. Kirby Tankships, Inc.*,
　　205 F.3d 1277 (11th Cir. 2000) ..........................................................15

*Gen. Elec. Co. v. Joiner*,
　　522 U.S. 136, 118 S. Ct. 512 (1997).............................................. 36, 44

*Gibbs v. Air Canada*,
　　810 F.2d 1529 (11th Cir. 1987) ..........................................................18

*Golden Shoreline Ltd. P'ship v. McGowan*,
　　787 So. 2d 109 (Fla. 2d DCA 2001) ....................................................33

*Greenblatt v. Drexel Burnham Lambert Inc.*,
　　763 F.2d 1132 (11th Cir. 1985) ..........................................................19

*Grobman v. Posey*,
　　863 So.2d 1230 (Fla. 4th DCA 2003) ..................................................31

*Hosp. Corp. of Am. v. Fla. Med. Ctr. Inc.*,
　　710 So.2d 573 (Fla. 4th DCA 1998) ....................................................49

*In re Managed Care Litig.*,
　　605 F.3d 1146 (11th Cir. 2006) ..........................................................25

*Isaacs v. Powell*,
　　267 So.2d 864 (Fla. 2d DCA 1962) ....................................................30

*Jackson Co. Hosp. Corp. v. Aldrich*,
　　835 So.2d 318 (Fla. 1st DCA 2002) ....................................................29

*Kumho Tire Co. v. Carmichael*,
　　526 U.S. 137, 119 S. Ct. 1167 (1999)..................................................36

*Loureiro v. Pools by Greg, Inc.*,
　　698 So.2d 1262 (Fla. 4th DCA 1997) ............................................ 32, 33

*McCovey v. Baxter Healthcare Corp.*,
　　298 F.3d 1253 (11th Cir. 2002) ..........................................................36

*Meruelo v. Mark Andrew of Palm Beaches, Ltd.*,
   12 So.3d 247 (Fla. 4th DCA 2009) ................................................................ 49, 50

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*,
   702 F.3d 1312 (11th Cir. 2012) ........................................................................24

*Montana v. United States*,
   440 U.S. 147, 99 S. Ct. 970 (1979)....................................................................24

*Nash v. Wells Fargo Guard Servs. Inc.*,
   678 So.2d 1262 (Fla. 1996)................................................................................31

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)............................................................................................25

*Parklane Hosiery v. Shore*,
   439 U.S. 322, 99 S. Ct. 645 (1979)....................................................................19

*Pearson v. Royal Caribbean Cruises Ltd.*,
   751 So.2d 125 (Fla. 3d DCA 2000) ...................................................................30

*Phillips v. Guarneri*,
   785 So.2d 705 (Fla. 4th DCA 2001) ..................................................................32

*Pleming v. Universal-Rundle Corp.*,
   142 F.3d 1354 (11th Cir. 1998) .........................................................................24

*Publix Super Markets Inc. v. Wilder Corp. of Del.*,
   876 So.2d 652 (Fla. 2d DCA 2004) ...................................................................50

*Quiet-Tech DC-8, Inc. v. Hurel Dubois UK Ltd.*,
   326 F.3d 1333 (11th Cir. 2003) .................................................................. 36, 45

*Regency of Palm Beach, Inc. v. QBE Ins. Corp.*,
   No. 08-81442-CIV, 2009 WL 2729959 (S.D. Fla. Aug. 25, 2009)....................50

*Rink v. Cheminova, Inc.*,
   400 F.3d 1286 (11th Cir. 2005) .........................................................................36

*Robinson v. Tyson Foods, Inc.*,
   595 F.3d 1269 (11th Cir. 2010) .........................................................................26

*Rosenfeld v. Oceania Cruises, Inc.*,
    682 F.3d 1320 (11th Cir. 2012) ..................................................................52

*Schiavo ex rel. Schindler v. Schiavo*,
    403 F.3d 1289 (11th Cir. 2005) ..................................................................20

*Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*,
    896 So.2d 787 (Fla. 2d DCA 2005) ...........................................................49

*So. Bell Tel. & Tel. Co. v. Florida Dept. of Transp.*,
    668 So.2d 1039 (Fla. 3d DCA 1996) ..........................................................29

*Three Keys, Ltd. v. Kennedy Funding Inc.*,
    28 So.3d 894 (Fla. 5th DCA 2009) .............................................................49

*United States v. Brown*,
    665 F.3d 1239 (11th Cir. 2011) ..................................................................15

*United States v. Majors*,
    196 F.3d 1206 (11th Cir. 1999) ..................................................................37

*Wells v. Tallahassee Mem'l Reg'l Med. Ctr., Inc.*,
    659 So.2d 249 (1995)....................................................................................6

*Winn Dixie Stores, Inc. v. White*,
    675 So.2d 702, 703 (Fla. 4th DCA 1996).....................................................33

*Y.H. Investments Inc. v. Godales*,
    690 So.2d 1273 (Fla. 1997)..........................................................................29

## Rules

FED. R. CIV. P. 56(a)...........................................................................................21

FED. R. CIV. P. 56(f)(3) .........................................................................................6

FED. R. CIV. P. 61 ...............................................................................................51

FED. R. EVID. § 702 ............................................................................................36

FED. R. EVID. 103(a)(1)(a) ...................................................................................14

FED. R. EVID. 103(b) ............................................................................15

## Statutes

FLA. STAT. § 768.81 ................................................................... 28, 31

## Rules

FED. R. CIV. P. 56(a)..............................................................................21

FED. R. CIV. P. 56(f)(3) ..........................................................................6

FED. R. CIV. P. 61 .................................................................................51

FED. R. EVID. § 702 ..............................................................................36

FED. R. EVID. 103(a)(1)(a) ....................................................................14

FED. R. EVID. 103(b) ............................................................................15

## Other Authorities

JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 15,14[1].......................47

RESTATEMENT (SECOND) OF JUDGMENTS § 27 ........................................................24

# STATEMENT OF THE ISSUES

1. Did TBW waive any complaint as to the admission of evidence of an alternate causation theory by failing to object to the evidence when it was introduced at trial?

2. Did the District Court properly exercise its discretion in permitting HDR to present evidence of an alternate causation theory where:

   A.    The summary judgment in favor of Barnard did not constitute a ruling on Barnard's actual fault;

   B.    Florida law permits an alternate causation defense regardless of the legal status of the alleged causal agent; and

   C.    The introduction of alternate causation evidence did not violate any principle of Florida law?

3. Did the District Court properly exercise its discretion in permitting HDR to offer expert testimony on causation when the expert's causation opinion was reasonably based on numerous factors and where the court determined that the expert had reasonably extrapolated from the test data?

4. Did the District Court properly exercise its discretion in denying TBW's motion to amend its pleading to raise an untimely, prejudicial, and futile claim?

5. TBW failed to obtain a jury finding that HDR breached any standard of care or that any such breach was a cause of its damages. In light of these failures, are any of the alleged errors of which TBW complains actually harmful?

# STATEMENT OF THE FACTS

TBW's Statement of the Facts and of the Case is generally accurate, but it is both overly detailed with matters having no relevance to this appeal and incomplete as to matters that are most relevant.

## Design of the Reservoir

This lawsuit concerns unusual cracking in the soil cement erosion cover of the C.W. Bill Young Regional Reservoir near Tampa, Florida. TBW owns the Reservoir. HDR designed it, and Barnard Construction Company was the general contractor.

Water held in an earthen reservoir tends to seep into the embankment. To minimize this seepage, the design of this Reservoir called for the use of plastic sheeting within the embankment, called the geomembrane. Because the geomembrane is subject to tearing and perforation when heavy equipment is driven on top of it, a protective layer of soil was placed over the geomembrane. After consultation with the geomembrane's manufacturer, it was determined the protective layer would be approximately two to three feet thick. Soil was then placed above the protective layer in horizontal layers or "lifts."

The inside slope of the Reservoir required protection from erosion due to wave action. The design called for the use of soil cement—a mixture of

1

approximately 10 percent cement and 90 percent soil. The soil cement was placed by bulldozers in vertical lifts atop the wedge of soil covering the geomembrane over most of the slope. The soil cement is not a structural element of the embankment. It is not reinforced and has a low tensile strength. Some cracking in the soil cement is expected and is even desirable to relieve pressure.

While this normal cracking, sometimes termed "alligator cracking," occurred in the soil cement throughout the Reservoir, there were two areas, localized in the southwest and northeast quadrants, where the cracking was far more significant and portions of the soil cement actually collapsed. These areas were ultimately repaired through the injection of cement grout into the cracks and the void areas underlying the soil cement. It is undisputed that the Reservoir remained safe and it has continued to operate.[1]

## The Parties Dispute the Cause of the Cracking

TBW sued HDR, Barnard, and other parties not pertinent to this appeal. TBW advanced the theory that the unusual cracking was caused by excess pore pressure, or "uplift." This theory posited that water was trapped within the embankment, specifically in the wedge of soil between the geomembrane and the

---

[1] Even with a fill restriction placed for a short period by the Florida Department of Environmental Protection, the Reservoir was kept in operation. Once grouting repairs were completed, the FDEP returned the Reservoir to full operations without restrictions.

soil cement. TBW theorized that as the water level of the Reservoir dropped during drawdown, the excess water trapped within the "wedge" exerted pressure, allegedly pushing the soil cement up and creating cracks and voids. (Dkt. 346, p. 4). TBW's expert criticized HDR's permeability rate assumptions, its computer modeling, the adequacy of its test borings, the accuracy of its data reporting, and the design and incorporation of a flat plate soil cement surface rather than a stair-step configuration. (Dkt. 671, pp. 1-2).

Until TBW entered into a collusive settlement with the general contractor Barnard, TBW and its experts also faulted Barnard for the cracking, contending, among other things, that the soil used in the "wedge" was not properly blended, creating areas of less permeable soil it called "lenses, pockets, streaks, and layers," which permitted the excess pore pressure to develop. (Dkt. 369).

HDR, however, contended that the mechanism causing the cracking was different. The cracking in the northeast corner occurred because the initial protective layer of soil layer placed over the geomembrane (the "protective layer") in a small portion of the embankment wedge was too loose, too thick and too dry. (Dkt. 346, pp. 9-10). When this soil became saturated, it lost volume and

3

collapsed.[2] The collapse created voids, which, over time, undermined the soil cement and caused it to crack.

The same phenomenon occurred in areas of the southwest corner, although the sequence of events was somewhat altered. Very heavy rainfall from three hurricanes occurred during the construction of this part of the embankment before the soil cement was placed, leaving the soil exposed to the elements. Soil washed down the embankment forming large erosion gullies. The contractors improperly repaired the gullies by backfilling with soil that was placed too loosely and improperly compacted. The soil in those gullies then collapsed when later saturated during the filling of the Reservoir. The parties referred to this causation theory as "collapse upon wetting" or "settlement upon saturation."

## <u>TBW's Collusive Settlement with Barnard</u>

TBW entered into a settlement agreement with Barnard. (Dkt. 307). Nominally, the settlement was a "high-low" agreement, obligating Barnard to pay a minimum of $750,000 with a theoretical maximum exposure capped at $5,000,000. (*Id*., p. 5). However, the agreement contained a number of extraordinary provisions ensuring that Barnard would never be subjected to the "high" portion of the settlement while requiring Barnard to remain a party to the

---

[2]  HDR's expert, Dr. Bromwell, explained this known phenomenon and compared the dry soil to fluffy beach sand which becomes saturated when the tide comes in and compacts. (Dkt. 719, pp. 190-91).

case and lend tactical assistance to TBW in the presentation of its case against HDR. The Settlement Agreement prohibited Barnard from presenting any evidence refuting several claims and positions of TBW, required Barnard to call certain witnesses at trial, precluded Barnard from calling other witnesses and prevented Barnard from filing any motions that would have the effect of removing it from trial. (*Id.*, pp. 6-9).

In addition to orchestrating how the trial would be conducted, the Settlement Agreement contained 133 paragraphs of "agreed facts" that TBW and Barnard stipulated would survive any order declaring the Settlement Agreement void or unenforceable, and which TBW filed as part of its Joint Pretrial Statement. (Dkt. 307 and Dkt. 346). Effectively, the stipulations precluded TBW from any further recovery from Barnard. For example, TBW stipulated that "HDR's defective design is the only reason the reservoir has to be repaired and taken out of service," and "if HDR had properly designed the reservoir, the relatively minor failures by Barnard to comply with the plans and specifications, as alleged by Tampa Bay Water, and denied by Barnard, would not have caused the unusual cracking." (Dkt. 307 at p. 19). The stipulations prevented TBW from establishing that any error it had alleged Bernard committed was the proximate cause of its damages.

5

## **The Court Acts to Protect HDR From the Collusive Settlement by Granting Summary Judgment on TBW's Claims Against Barnard**

HDR moved to void the settlement, contending that it constituted an improper collusive agreement prohibited by *Dosdourain v. Carsten*, 624 So.2d 241 (Fla. 1993). (Dkt. 323). The motion suggested several remedies available to the Court to protect the judicial system from abuse and prevent unfair prejudice to HDR. These potential solutions included declaring the agreement void, severing the unlawful portions of the agreement, dismissing the claim against Barnard for lack of subject matter jurisdiction, dismissing the claim against Barnard pursuant to Rule 41(b) for want of prosecution, and rendering summary judgment *sua sponte* pursuant to FED. R. CIV. P. 56(f)(3). (*Id.*, pp. 20-25).[3]

The District Court entered an order requiring TBW to show cause why summary judgment should not be granted to Barnard, and requiring TBW to identify evidence "that would support a finding for Plaintiff against Barnard." (Dkt. 365). TBW opposed the entry of a summary judgment, contending that, despite the stipulations, it was still possible for TBW to recover on its claim against Barnard based upon the existence of lenses, pockets, streaks and layers of soil with different permeability. (Dkt. 369). HDR did not oppose the entry of

---

[3]  HDR stated in its Motion, and each subsequent filing on the subject, that any summary judgment should not prejudice its right to have Barnard's fault apportioned under *Fabre v. Marin*, 623 So.2d 1182 (Fla. 1993), receded from by *Wells v. Tallahassee Mem'l Reg'l Med. Ctr., Inc.*, 659 So.2d 249 (1995)

summary judgment in favor of Barnard on the claims TBW had actually asserted, but insisted that such a judgment should not operate to deny its *Fabre* rights.

The District Court granted a *sua sponte* summary judgment in Barnard's favor. (Dkt. 417). The Court found that the stipulations (as well as similar exculpatory statements made by TBW in the Joint Pretrial Statement) precluded TBW from recovering on its claims against Barnard. The Court found that "any mention of Barnard or damages allegedly caused by construction defects" was "conspicuously absent" from the statement of TBW's case in the Joint Pretrial Statement. (*Id*. at p. 2). The Court's order said nothing about any causation defense HDR might have. After all, HDR's causation theory (collapse upon wetting) did not affect Barnard's exposure to TBW because TBW had never asserted an affirmative claim against Barnard that depended upon the theory. The District Court Order granted summary judgment on the counts of TBW's Second Amended Complaint that pertained to Barnard. (Dkt. 417, p. 9). In light of its ruling, the District Court indicated it was unnecessary to determine the validity of the settlement. (*Id*. at p. 2).

HDR promptly moved for leave to add Barnard as a *Fabre* defendant. (Dkt. 428). Ultimately, the district court denied HDR's motion without a hearing. (Dkt. 538). Again, the order denying the motion said nothing regarding any causation defense that HDR might assert against TBW's claims.

## The Court Clarifies That the Summary Judgment Did Not Preclude HDR's Causation Defense

Before trial, TBW filed Motion in Limine No. 10, seeking to preclude HDR from introducing evidence of the collapse-upon-wetting theory. The motion was based upon three legal grounds: (1) judicial estoppel; (2) collateral estoppel; and (3) lack of relevance given that Barnard was not a *Fabre* party. (Dkt. 540). HDR opposed the Motion in Limine (Dkt. 553), arguing that the question of causation was distinct from that of apportionment of responsibility, that collateral estoppel did not preclude the causation arguments because the collapse-upon-wetting theory had not been litigated in the summary judgment, and because the summary judgment was based upon stipulations between TBW and Barnard that could not bind HDR.

The Court conducted a lengthy hearing on the Motion in Limine on February 16, 2012. (Dkt. 663). Following the presentations by counsel, the District Court observed that the elements of collateral estoppel had not been satisfied. The summary judgment adjudicated Barnard's liability to TBW, but did not adjudicate the actual cause of the cracking. It certainly did not adjudicate the validity of the factual basis of the collapse-upon-wetting theory. (*Id.*, pp. 136-143). TBW did not assert that theory as part of its case against Barnard. Consequently, as the District Court recognized, none of the facts stipulated between TBW and Barnard were

8

*material* facts that could have potentially precluded summary judgment. (*Id.*). Consequently, the Court denied TBW's Motion in Limine No. 10.

## The Jury Finds That HDR Was Not Legally Responsible

The case was tried before a jury for 19 days. HDR presented evidence that it did not violate the standard of care. It also vigorously contested TBW's excess pore pressure causation theory. HDR also presented evidence of the collapse-upon-wetting theory. Plaintiffs made no objection at trial to any of the evidence on the grounds that it was precluded by the summary judgment in favor of Barnard.

At the conclusion of the trial, the jury was asked, "Did Defendant, HDR Engineering, Inc. ('HDR') breach its standard of care under the contract by defectively designing the Reservoir embankment in a manner that was the legal cause of damages to Tampa Bay Water?" After deliberating approximately four hours, the jury found that it did not. (Dkt. 631). The District Court subsequently entered a judgment in HDR's favor. (Dkt. 635). TBW's subsequent Motion for New Trial was denied. (Dkt. 671).

# SUMMARY OF THE ARGUMENT

After 19 days of trial, TBW failed to persuade the jury that HDR had breached its standard of care and caused damages to TBW. As the District Court observed, ample evidence supported the jury's verdict:

> In sum, TBW's theory of liability was refuted by HDR's witnesses, its experts were effectively challenged, and the jury could have found its claim for damages exaggerated, thereby undermining the credibility of the entire case. Independently weighing the evidence, this Court concludes that the jury's verdict absolving HDR of negligently designing the reservoir was not against the great weight of the evidence. The relatively short length of deliberations (just under four hours, including lunch) says as much.

(Dkt. 671, pp. 6-7). By this appeal, TBW seeks a second chance to prove its case. It fails, however, to show that the District Court made any error in the trial or that its substantive rights were denied.

TBW complains that HDR should not have been permitted to present evidence to defend itself on causation by offering its alternative collapse-upon-wetting theory. TBW failed, however, to object to any of the evidence at trial on the grounds it raises here. The Court's ruling on TBW's overbroad Motion in Limine does not constitute a "definitive" ruling on the admissibility of any evidence. TBW has waived any error by its failure to make a timely, specific objection.

10

TBW is also wrong on the substance of its complaint. The District Court carefully reviewed the record and determined that the summary judgment in favor of Barnard did not "exonerate" it, but only determined that it was not liable to TBW as a result of stipulations entered into between TBW and Barnard. The collapse-upon-wetting theory advanced by HDR was not material to the TBW/Barnard dispute, and was not adjudicated when the summary judgment was entered. Consequently, TBW's attempt to invoke collateral estoppel fails. Judicial estoppel is also inapplicable. HDR did not take any inconsistent position, but contended that the excessive cracking was caused by collapse upon wetting throughout the litigation. TBW, not HDR, is guilty of prejudicial inconsistency.

No principle of Florida common or statutory law precluded HDR from advancing its causation defense. Barnard's actual fault had not been determined by the summary judgment. Even if it had, Florida law permits a defendant to defend against Plaintiff's causation theory by pointing to the acts of another causal agent, even if that causal agent could not be liable to the Plaintiff. In this case, HDR's collapse upon wetting theory did not depend upon a determination that Barnard had actually been negligent. HDR did not contend that Barnard was negligent at trial, and the jury was not asked to assess Barnard's fault. There was no conflict between the evidence that HDR presented and the District Court's grant of summary judgment in Barnard's favor.

11

TBW raises a *Daubert* objection to the testimony of Dr. Leslie Bromwell. The objection disregards the great bulk of Dr. Bromwell's testimony and the multiple bases for his opinion. The objection focuses on a small portion of his testimony concerning mathematical extrapolations from certain test data. The criticisms of this testimony are inaccurate. Dr. Bromwell performed basic mathematical extrapolations of the kind approved by this Court. Ultimately, the case involved a dispute between experts, which was properly left to the jury to consider.

TBW also complains that the District Court did not grant leave to amend its pleading to add a count alleging the breach of the covenant of good faith. Yet, it fails to show that the District Court was incorrect in concluding that TBW had delayed unjustifiably in asserting its claim. In any event, the proposed amendment was futile. The covenant of good faith is not a free-standing cause of action and fails in the absence of a breach of the contract's terms. The jury failed to find that HDR had breached its contract with TBW, making it impossible for TBW to recover under the covenant in any event.

Finally, TBW has not shown that any alleged errors could have been harmful. The jury's negative finding could well have been based on a determination that HDR did not breach any standard of care or that TBW had failed to establish its own causation theory. Evidence supporting either conclusion

was sufficient. Under the record, TBW cannot show that the admission of evidence of the collapse-upon-wetting theory affected any of its substantial rights.

# ARGUMENT
# and
# CITATIONS OF AUTHORITY

I.  THE DISTRICT COURT CORRECTLY PERMITTED HDR TO PRESENT A CAUSATION DEFENSE

TBW contends that the District Court should not have permitted HDR to introduce evidence regarding the collapse-upon-wetting theory. The District Court's ruling was well within the proper bounds of its discretion. However, this Court need not even evaluate the District Court's resolution. TBW did not preserve its objection to the admission of any of the evidence.

## A.     TBW Has Failed to Preserve Any Complaint to the Admission of Evidence

TBW did not object to the introduction of any evidence pertaining to HDR's causation theory at trial on the grounds its admission was precluded by the summary judgment entered by the District Court. Consequently, TBW waived any complaint as to its admission. Fed. R. Evid. 103(a)(1)(a). Indeed, TBW itself submitted evidence through its first witness that it originally sued Barnard for construction errors. (Dkt. 709, pp. 60 – 63).

The only objection to the evidence TBW mentions is its Motion in Limine No. 10. (Dkt. 540). Reliance on the overbroad Motion in Limine cannot overcome the absence of an objection when the evidence was introduced.

14

First, the overruling of a motion in limine is generally insufficient in itself to preserve an objection. In almost all instances, the party must object when the evidence is introduced at trial. *See United States v. Brown*, 665 F.3d 1239, 1247 (11th Cir. 2011); *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1285 (11th Cir. 2000). Having failed to object at trial, TBW has waived any potential error. TBW argues in its Reply in Support of Its Motion to Certify Question to the Florida Supreme Court that a pretrial ruling is sufficient to preserve an objection if it is "definitive." *See* FED. R. EVID. 103(b).

The "definitive ruling language" was added to Rule 103 in 2000. Yet, as this Court's ruling in the 2011 *United States v. Brown* case makes clear, the mere denial of a motion in limine is not regarded as such a definitive evidentiary ruling. 665 F.3d at 1247. Courts frequently deny motions in limine without ruling that particular evidence is admissible. Admissibility may depend upon whether other facts have been established or a proper predicate has been presented. Accordingly, the party opposing such evidence must object when it is offered at trial.

Second, even if some rulings on motions in limine can be regarded as "definitive," this particular ruling was not. Indeed, the Motion in Limine was so overbroad and non-specific as to make a definitive ruling impossible. The Motion sought the exclusion of *any* evidence supporting the collapse-upon-wetting theory. It was not directed to any particular testimony or document. Tellingly, TBW's

15

Brief fails to identify any particular evidence that, in its view, should have been excluded on the grounds it has raised. This lack of specificity is fatal, for much of the evidence supporting the collapse-upon-wetting theory was admissible for other reasons. For instance, the very substantial evidence showing that TBW's excess pore pressure theory was inconsistent with the physical facts was always admissible to defend against TBW's causation contentions, even if HDR was not permitted to refer to the collapse upon-wetting-theory directly.

Finally, the District Court's ruling on the Motion in Limine, while preserving HDR's right to mount a causation defense, did not rule that any particular evidence was admissible. In fact, the court reiterated that its ruling on the *Fabre* motion remained intact and obtained a commitment from HDR's counsel that it would not present direct evidence that Barnard was negligent at trial. (Dkt. 663, p. 135). TBW made no objection at trial that any particular evidence violated this undertaking.[4]

---

[4] In fact, TBW stated affirmatively at trial that it had no objection to the admission of exhibits 1018, 1130, 1134 and 1341, all of which served both to rebut TBW's pore-pressure theory and to affirmatively establish the collapse of the overly-thick protective layer.

16

### B.    The Summary Judgment Did Not Preclude HDR's Causation Defense

#### 1.    *The Effect of the Judgment is a Matter of Federal Law*

TBW's motion incorrectly assumes that the admissibility of evidence of collapse-upon-wetting in light of the summary judgment is somehow controlled by Florida substantive law. In fact, it is a federal procedural issue. This Court has clarified that the effect of a judgment rendered in a federal court remains a question of federal law. *CSX Transp. Inc. v. Brotherhood of Maintenance of Way Employees*, 327 F.3d 1309, 1316 (11th Cir. 2003). "Even in a case which rests subject matter jurisdiction solely upon diversity of citizenship, a federal court must apply federal law to determine the preclusive effect of a prior federal court decision." *Citibank N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1501 (11th Cir. 1989). TBW has explicitly acknowledged that federal law governs the questions raised in Motion in Limine No. 10. (Dkt. 540, p. 4, n.10).

In *Citibank*, a counterclaimant sued seven bank directors and alleged that Citibank was vicariously liable because the directors had acted as its agents. The counterclaimant settled with the directors and the court dismissed the claims against the directors with prejudice. The settlement agreement purported to reserve the counterclaimant's claims against Citibank. Citibank moved for judgment, arguing that the dismissal with prejudice of the claims against the directors had the

effect of extinguishing its vicarious liability. *Id*. at 1500. Although the district court had correctly stated Florida law that "a principal cannot be held liable if the agent is exonerated," the court of appeals was required to apply federal law to determine whether the order of dismissal precluded the claim against Citibank. *Id*. at 1501; *citing Empire Fire & Marine Ins. Co. v. J. Transp.*, 880 F.2d 1291, 1293 n.2 (11th Cir. 1989); *Gibbs v. Air Canada*, 810 F.2d 1529, 1535 (11th Cir. 1987).

The controlling question then is whether, as a matter of federal law, the summary judgment in favor of Barnard conclusively established that the excessive cracking was *not* caused by collapse upon wetting. Under the governing abuse-of-discretion standard, TBW has an extremely difficult task in making this assertion because the District Court—the very court that granted the summary judgment—held that the summary judgment did not decide that issue. TBW must somehow convince this Court that the District Court did not understand its own ruling. In fact, the record shows that the District Court's ruling on Motion in Limine No. 10 is entirely consistent with the summary judgment in favor of Barnard.

## 2. *Collateral Estoppel Does Not Preclude HDR's Causation Defense*

### a.    The Requirements of Collateral Estoppel

Collateral estoppel refers to the concept of "issue preclusion." It prohibits the relitigation of an issue that has been previously litigated and decided. *Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000). The collateral estoppel doctrine

serves the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or a party in privity, and promoting judicial economy by precluding needless litigation. *Parklane Hosiery v. Shore*, 439 U.S. 322, 326, 99 S. Ct. 645, 649 (1979).

To apply collateral estoppel: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that earlier action; and (4) the party against whom the prior decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding. *Greenblatt v. Drexel Burnham Lambert Inc.*, 763 F.2d 1152, 1160 (11th Cir. 1985). The application of collateral estoppel is committed to the sound discretion of the district court and is reviewed for abuse of discretion. *Dalide v. U.S. Attorney General*, 387 F.3d 1335, 1341 (11th Cir. 2004).

### b.    Collateral Estoppel Does Not Apply to a Ruling in the Same Case

Initially, collateral estoppel cannot be applied because the doctrine is concerned with adjudications made in *previous* litigation, not in the same case. The Supreme Court has clarified that res judicata and collateral estoppel do not apply where a party moves the rendering court to correct or modify its own judgment. *Arizona v. California*, 460 U.S. 605, 619, 103 S. Ct. 1382 (1983). *See also Amcast*

*Indus. Corp. v. Detrex Corp.*, 45 F.3d 155, 158 (7th Cir. 1995); *Cowgill v. Raymark Indus.*, 832 F.2d 798, 802 (3d Cir. 1987), citing 1B J. Moore, J. Lucas & T. Currier, MOORE'S FEDERAL PRACTICE ¶ 39,415[2], 517 (3d ed. 1984).[5]

But even if TBW *could* assert collateral estoppel flowing from the summary judgment in favor of Barnard, it could not show that the elements of the doctrine were met.

### c. The Summary Judgment Only Determined Barnard's Liability to TBW, Not Its Actual Fault

To prevail, TBW must show the summary judgment determined as a matter of law that collapse upon wetting did not cause the excessive cracking at the Reservoir. However, the summary judgment did not determine that issue. In, fact it did not even determine that Barnard was free from fault or that its work played no causal role in creating the excessive cracking. The issues governing the summary judgment were not the issues determined at trial. The summary judgment only adjudicated that Barnard was free from liability *to TBW* because *TBW* had stipulated away the facts necessary to establish liability under the theories that

---

[5] The separate law-of-the-case doctrine governs the preclusive effect of orders entered in the same case. *See generally Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1292-93 (11th Cir. 2005). TBW has never contended that the law of the case doctrine applies here.

*TBW had advanced*. But TBW had never advanced the collapse upon wetting theory in its case against Barnard. As the District Court explained:

> I understand TBW's argument that as far as it was concerned the issue at stake in the summary judgment was Barnard's fault. But if you look closely, it's not fault. It's the liability of Barnard to TBW. Under no set of facts *that TBW could advance* was there any liability of Barnard to TBW. That is a wholly different issue than whether or not HDR can as a defense point to collapse-upon-wetting as the cause for the cracks that TBW complains of and the allegation that the design was negligent.

(Dkt. 663 at 140) (emphasis added).

TBW had never asserted that Barnard was at fault in creating a condition leading to "collapse upon wetting." TBW did not resist summary judgment on the basis that Barnard had created such a condition. Indeed, TBW and its experts steadfastly resisted HDR's contention that the excessive cracking was caused by collapse upon wetting. That theory was never part of TBW's case against Barnard and hence was not material to the question of whether Barnard was liable to TBW. *See* FED. R. CIV. P. 56(a) (only material issues of fact preclude summary judgment). As the District Court explained:

> Although HDR certainly had an opportunity to litigate if it chose in response to the summary judgment this concept of collapse-upon-wetting, that wasn't an issue raised by TBW or Barnard and it really *had nothing to do with TBW's claim against Barnard*; so, therefore, it wasn't part of that summary judgment proceeding.

21

> Certainly, it was referenced in the agreed facts and
> there's some tidbits about the experts having some
> disagreement. But *that wasn't a contention that TBW had*
> *that was resolved in favor of Barnard*.
>
> *So it was not the identical issue. It was not actually*
> *litigated in that summary judgment proceeding*. And it
> certainly was not a critical and necessary part of that
> summary judgment. What was resolved in that
> proceeding was simply that TBW could not under any set
> of circumstances prove its case against Barnard. The
> issue then was Barnard's liability to TBW on its claims.

(Dkt. 663 at 138-39) (emphasis added).

Because collapse upon wetting was not a material issue between TBW and

Barnard, the summary judgment disposing of TBW's claims against Barnard

(which were based upon TBW's excess pore pressure theory) could not affect the

validity of HDR's causation defense:

> The sole question as far as I am concerned is this—on
> this motion is whether the issue of collapse-upon-wetting
> is the identical issue at stake in the summary judgment
> ruling, and I find that it was not. There is a difference
> between TBW's claim against Barnard and this defense
> that HDR is raising. HDR is entitled and it would be
> unfair not to allow it to defend the allegation that its
> design negligence was the proximate cause of the
> cracking. It should be able to defend against an allegation
> by establishing that the cause was other than a negligent
> design, that is, that it was the result of collapse-upon-
> wetting.

(Dkt. 663 at pp. 141-42). The District Court explained that the collapse upon

wetting theory of causation was a defense to plaintiff's claims: "It's not something

22

that would have been brought up in the summary judgment other than gratuitously through the agreed statement of fact between Barnard and TBW." (Dkt. 663 at 140).

The record fully confirms the District Court's ruling. Its original show cause order directed TBW to present evidence showing that its claims against Barnard were still viable *in light of the stipulations*: "Specifically, Plaintiff shall show as a matter of law and fact that notwithstanding (1) the provisions of the Settlement Agreement . . . limiting the evidence that may be offered by the Settling Parties at trial and (2) especially the admissions in the Agreed Facts incorporated therein, the record contains evidence from which a reasonable jury could find for Plaintiff and against Barnard on Counts II and IV." (Dkt. 365, pp.1-2). TBW's opposition to the granting of the summary judgment did not rely upon "collapse upon wetting." The order granting summary judgment was explicitly *based upon the stipulations*, not upon any determination that Barnard was not actually at fault in that it did not actually cause the unexpected cracking at the reservoir. "In light of the Agreed Facts, TBW cannot seriously contend that the presence of lenses, products, streaks and layers was a concurring cause that contributed to its damages . . . . TBW's sole theory of liability has been foreclosed by its own admissions." (Dkt. 417, p. 6).

The District Court's ruling is amply supported by the applicable authority. In determining whether an issue has actually been litigated, this Court has applied the

formulation of the Restatement of Judgments, which requires consideration of whether the issue was properly raised by pleadings or otherwise, whether the issue was submitted for determination and whether it was actually determined. *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998), citing RESTATEMENT (SECOND) OF JUDGMENTS § 27, cmt. d. The District Court engaged in a painstaking analysis of the Summary Judgment record and determined which issues were raised and actually determined by the *sua sponte* summary judgment. TBW's Brief fails to show how the District Court's review of the record was mistaken in any way. Certainly, as the very court rendering the Summary Judgment, the District Court was in the best position to conclude its intent and scope. There is no basis to determine that the District Court abused its discretion in refusing to apply collateral estoppel to bar HDR's causation defense.

Collateral estoppel may not be applied where there is a difference in the factual background of the prior judgment and the matter sought to be precluded. "Changes in fact essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues." *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1319 (11th Cir. 2012), *quoting Montana v. United States*, 440 U.S. 147, 159, 99 S. Ct. 970, 976 (1979). Hence, a party "need only point to one material differentiating fact that would alter the legal

inquiry here and thereby overcome the preclusive effect." *CSX Trans.*, 327 F.3d at 1317.

The summary judgment proceeding relied upon a universe of facts bounded by the TBW/Barnard stipulations and was expressly based on TBW's inability to recover because of the stipulations. But at trial, HDR was not bound by stipulations to which it never was a party. It was certainly free to offer a defense to TBW's excess pore pressure theory, to offer a different theory of causation based upon "collapse upon wetting," and to contradict TBW's private stipulation with Barnard.

### 3.  *Judicial Estoppel Does Not Bar HDR's Causation Defense*

Denials of assertions of judicial estoppel are also reviewed under the abuse-of-discretion standard. *In re Managed Care Litig.*, 605 F.3d 1146, 1150 (11th Cir. 2006). The District Court correctly refused to apply the doctrine here.

The purpose of judicial estoppel is to "protect the integrity of the judicial system by prohibiting parties from changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808 (2001). While the circumstances under which a court might invoke judicial estoppel may vary, the factors typically forming the decision include: (1) whether the present position is clearly inconsistent with the earlier position; (2) whether the party succeeded in persuading the court to accept the earlier position, so that judicial acceptance of the inconsistent position in a later proceeding will create the

perception that either the first or second court was misled; and (3) whether the party advancing the inconsistent position would derive an unfair advantage. *Id*. at 750-51. *See also Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010).

In the leading Eleventh Circuit case on judicial estoppel, *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282 (11th Cir. 2002), the court outlined two primary factors for establishing judicial estoppel: "First, it must be shown that the legally inconsistent positions were made under oath in a prior proceeding. Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system." *Id*. at 1285. In applying the test, the courts must always give due consideration to all the circumstances of a particular case. *Id.* at 1286.

The basic requirements of judicial estoppel are entirely absent in this case. HDR never took an inconsistent position on causation in the litigation. On the contrary, it consistently contended that the excessive cracking at the Reservoir was caused by "collapse upon wetting." In suggesting that the District Court consider a *sua sponte* summary judgment, HDR did not contend that Barnard was not *actually* responsible, but only that *TBW*'s stipulation with Barnard made it impossible for *TBW* to recover based on the theories that *TBW* had advanced. (Dkt. #323, p. 24). HDR insisted that, notwithstanding any summary judgment in Barnard's favor, it was entitled to designate Barnard as a *Fabre* defendant and promptly moved to add

26

Barnard as a *Fabre* defendant as soon as the summary judgment was entered. HDR never contended that collapse upon wetting was *not* the causal mechanism responsible for the excess cracking at the Reservoir.

It was not HDR's consistent position on the causation issues, but TBW's gamesmanship in entering into the collusive settlement with Barnard that was calculated to make a mockery of the judicial system. TBW originally sued Barnard, contending that Barnard was responsible, at least in part, for the excess cracking. Then it settled with Barnard, foreclosing any further liability to Barnard through stipulations, yet required Barnard to remain in the case to support TBW's claims against HDR. These tactics, rejected by the Florida Supreme Court in *Dosdourian*, are contrary to public policy. TBW then opposed the proposed summary judgment asserting that it could still recover against Barnard despite the stipulations. The District Court did not accept this inconsistent position by TBW.

Once the District Court granted the summary judgment and TBW's tactical plan was foiled, TBW shifted position yet again and argued that the judgment precluded consideration of Barnard's fault in any degree, even preventing consideration of a causation theory that could possibly be associated with an attempt to place Barnard at fault. When the full procedural history of the case is considered, it is apparent that TBW, not HDR, is guilty of asserting inconsistent positions, which would have made a mockery of the judicial proceeding.

27

### C.    No Provision of Florida Law Precluded HDR's Causation Defense

TBW contends that permitting HDR to defend against causation violates some tenet of Florida law. It fails, however, to identify any statute or common law rule that precludes a defendant from presenting evidence that the proximate cause of an injury were the acts of a former defendant in whose favor summary judgment has been granted.

Florida's comparative fault statute, FLA. STAT. § 768.81, sets up an apportionment scheme that abolishes joint and several liability in most cases and establishes standards for the submission of the fault of nonparties. *See generally D'Angelo v. Fitzsmaurice*, 863 So.2d 311, 314 (Fla. 2003). The statute does not purport to govern the effect of a summary judgment—certainly not a federal court's judgment—or the evidence that may be admitted in a case following a summary judgment disposing of one of the defendants. Nor does any Florida common law doctrine.

### 1.    *Barnard Was Not Determined Faultless*

TBW's argument is founded on three fundamental misconceptions. The argument depends entirely upon the assumption that the summary judgment adjudicated that Barnard was actually without fault in causing the unexpected cracking. The trio of cases upon which TBW most relies—*Crowell v. Kaufmann*, 845 So.2d 325, 327 (Fla. 2d DCA 2003); *Jackson Co. Hosp. Corp. v. Aldrich*,

835 So.2d 318, 331 (Fla. 1st DCA 2002) and *So. Bell Tel. & Tel. Co. v. Florida Dept. of Transp.*, 668 So.2d 1039, 1041 (Fla. 3d DCA 1996)—are all based on the unremarkable proposition that there must be some evidence of a *Fabre* defendant's fault for the *Fabre* defendant to be submitted on the verdict form, and, thus, a party adjudicated free from fault upon a summary judgment motion may not be placed on the form. Those cases have no bearing on this appeal because Barnard, the summary judgment defendant in this case, was not placed on the verdict form.

TBW does not contend that a summary judgment on *any* ground would preclude the jury from considering the fault of the party in whose favor the judgment was rendered. Such a rule would be flatly inconsistent with Florida law. The Florida Supreme Court has repeatedly held that even persons and entities that are immune from liability may be made *Fabre* defendants. *See, e.g., Y.H. Investments Inc. v. Godales*, 690 So.2d 1273 (Fla. 1997) (parental immunity); *Allied-Signal Inc. v. Fox*, 623 So.2d 1180 (Fla. 1993) (statutory employer's immunity). Liability to the plaintiff is not a prerequisite for a *Fabre* defendant. Thus, the bare fact that Barnard received a summary judgment did not preclude HDR from naming Barnard a *Fabre* defendant, much less preclude it from asserting that Barnard's actions played a role in causing TBW's alleged damages.

### 2. *A Defendant May Assert Alternative Causation Regardless of the Legal Status of the Alleged Causal Agent*

TBW confuses the distinct concepts of causation and apportionment. In all cases, a plaintiff must prove that defendant's breach of duty caused its damages. Defendants may rebut Plaintiff's causation allegations in various ways. One way is to allege that some causal agent other than the defendant was the actual cause.

Florida defendants have always been permitted to argue that the acts of a third person or entity were the actual, sole cause of the plaintiff's injuries, regardless of whether that third person or entity is liable to the plaintiff. When a defendant files a general denial, it places the plaintiff on its proof, places causation at issue, and allows the defendant to argue that another person or thing was the cause of the plaintiff's injuries. *Clement v. Rousselle Corp.*, 372 So.2d 1156, 1158 (Fla. 1st DCA 1978). *See also Pearson v. Royal Caribbean Cruises Ltd.*, 751 So.2d 125, 126 (Fla. 3d DCA 2000). Hence, defendants have successfully defended causation by pointing to the actions of persons immune from suit as the result of parental immunity, *Isaacs v. Powell*, 267 So.2d 864 (Fla. 2d DCA 1962), or the operation of the workers compensation statute. *Clement*, 372 So.2d at 11.

This type of causation argument is an up-or-down proposition. If plaintiff establishes that the defendant's breach of duty *is* a cause of its injuries, plaintiff

may recover even if there are other causal agents for which the defendant is not responsible.

By contrast, the Florida apportionment scheme permits a *liable* defendant to shift a *portion* of responsibility upon a person or entity that is also at fault. *See Grobman v. Posey*, 863 So.2d 1230, 1234 (Fla. 4th DCA 2003) (apportionment statute governs responsibility among joint tortfeasors). Where the alleged causal agent is a non-party, it may be designated as a *Fabre* defendant. The responsibility of a *Fabre* defendant is submitted to the trier of fact along with the responsibility of the defendants and the plaintiff. The defendant is, in most cases, responsible only for the percentage of responsibility attributed to the defendant. FLA. STAT. § 768.81. The responsibility of a *Fabre* defendant is an affirmative defense and the defendant must plead the identity of the allegedly responsible non-party and submit evidence of its responsibility. *Nash v. Wells Fargo Guard Servs. Inc.*, 678 So.2d 1262, 1264 (Fla. 1996). The defendant bears the burden to prove the responsibility of a *Fabre* defendant.

Here, no question of apportionment existed. HDR was not permitted to assert that Barnard was responsible as a *Fabre* defendant, and Barnard's fault was not determined by the jury. HDR merely offered a theory of causation that rebutted TBW's theory. No rationale founded in Florida substantive law precludes a party from defending causation based on the assertion that another causal agent was

31

actually responsible simply because a summary judgment had been entered in favor of that causal agent. It is not surprising that TBW finds no case authority making any such holding. TBW is forced to rely upon an unpublished magistrate's recommendation that does not even cite or address the Florida case law regarding the right to raise a causation defense. *Allen v. Dillon Transport, Inc.,* 2003 WL 24889457 (M.D. Fla. Dec. 9, 2003). The District Court's order is more authoritative than the magistrate's recommendation and carefully explains why the summary judgment did not adjudicate the collapse-upon-wetting theory. (Dkt. 663, p. 136-143).

Similarly, TBW's reliance on *Phillips v. Guarneri,* 785 So.2d 705 (Fla. 4th DCA 2001) is misplaced. The controlling issue in that case was whether the court's prior summary judgment ruling precluded plaintiff from recovering. The court of appeals found that the trial court had erred in its application of the prior judgment and that the plaintiff's case against the remaining defendant should have been permitted to proceed. The court of appeals never even addressed the so-called "empty chair" motion in limine to which TBW refers.

However, Florida authority *does* exist holding that the defendant may assert the actions of a party that cannot be made a *Fabre* defendant is the cause of the plaintiff's damages. In *Loureiro v. Pools by Greg, Inc.*, 698 So.2d 1262 (Fla. 4th DCA 1997), plaintiff argued that the erroneous inclusion of *Fabre* defendants on

the jury charge allowed the defendant to improperly cast blame on those defendants. Although the court of appeals agreed the *Fabre* defendants should not have been included in the jury form, it found the error was harmless: "Even had the issue of non-party liability been omitted from the instructions and the verdict form [the defendant] *could still have contended at trial that it was not negligent and that the negligence of others was the sole cause of the injury.*" *Id.* at 1264 (emphasis added). The *Loureiro* court recognized what TBW does not: causation and apportionment are separate issues.

### 3. The Collapse-Upon-Wetting Theory Does Not Depend On a Finding that Barnard was at Fault

Finally, TBW incorrectly assumes that the collapse-upon-wetting theory necessarily involves a reassessment of Barnard's negligence. But this is not so. HDR did not contend that Barnard violated any standard of care.

Nor does the collapse-upon-wetting theory of causation necessarily imply that Barnard was negligent. Not every unfortunate or unintended result is the consequence of negligence. *See Chomont v. Ward*, 103 So.2d 635 (Fla. 1958) (explaining concept of unavoidable accident). *See also Golden Shoreline Ltd. P'ship v. McGowan*, 787 So. 2d 109, 111 (Fla. 2d DCA 2001) ("The mere fact that the elevator fell does not, of itself, establish negligence on the part of Golden Shoreline."); *Winn Dixie Stores, Inc. v. White*, 675 So.2d 702, 703 (Fla. 4th DCA 1996) ("Negligence, however, may not be inferred from the mere happening of an

33

accident alone."). Barnard may well have met the standard of care applicable to a general contractor even if in limited instances some soil was placed too thick or dry in the protective layer. Hence, even if Barnard had been "exonerated" from negligence by the summary judgment, as TBW incorrectly contends, such an exoneration does not adjudicate whether the collapse-upon-wetting causation theory is valid.

II.   THE DISTRICT COURT CORRECTLY FULFILLED ITS GATEKEEPER FUNCTION IN ADMITTING DR. BROMWELL'S TESTIMONY

Dr. Leslie Bromwell offered testimony that: (1) the unexpected cracking was not due to pore pressure; (2) the unexpected cracking was caused by collapse upon wetting; and (3) cracking issues could be remedied without the complete reconstruction of the embankment that TBW advocated. Bromwell possesses impressive qualifications. He obtained Bachelor and Doctorate degrees from the Massachusetts Institute of Technology and later taught there. He has worked as a geotechnical consulting engineer for more than 40 years. A life member of the American Society of Civil Engineers, he has written over 70 technical publications, including one that won the Norman Medal of the American Society of Engineers for the outstanding technical paper of the year. Dr. Bromwell was named engineer of the year by two separate Florida organizations. (Dkt. 317-1, Exhibit A; Dkt. 719, pp. 106-114).

34

Dr. Bromwell also has extensive experience in reservoir design and the use of soil cement, dating back to his time at MIT. (*Id.*, pp. 106, 115-118). It would be difficult to imagine a more qualified witness to provide opinion testimony and, indeed, TBW has never challenged Dr. Bromwell's qualifications.

TBW did, however, file a pre-trial motion to exclude Dr. Bromwell's testimony as unreliable. TBW's challenge was extremely narrow, focusing entirely on one aspect of his opinion. Dr. Bromwell had examined data obtained from laboratory testing of the soil performed by Law Engineering during the site preparation phase of the construction of the embankment in 1999 and 2000, for the limited purpose of corroborating his knowledge and scientific literature indicating that the soil types used in the embankment have the capacity to collapse upon saturation. (Dkt. 721, pp. 134-35). TBW does not criticize the reliability of the tests performed by Law or question the data generated by those tests. TBW's motion argued that the particular test methodology used in the Law tests measures the combined effect of saturation and loading rather than saturation alone. TBW contends that Bromwell cannot use mathematical calculations to determine the amount of collapse attributable to saturation.

## A.    Standards Governing Expert Testimony

The admission of expert evidence is governed by Federal Rule of Evidence 702:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in a form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. § 702. District courts must function as gatekeepers to admit expert testimony only if it is reliable and relevant. *See Daubert v. Merrell-Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 2795 (1993).

The task of evaluating the liability of expert testimony is uniquely entrusted to the district court. *McCovey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Accordingly, this Court gives the district court "considerable leeway" in the execution of its duty. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). A district court's decision on the admissibility of expert testimony is reviewed under an abuse of discretion standard. *Kumho Tire*, 526 U.S. at 152; *Rink*, 400 F.3d at 1291. This standard requires that the court defer to the district court's ruling unless the ruling is "manifestly erroneous." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142, 118 S. Ct. 512, 517 (1997); *Quiet-Tech DC-8, Inc. v. Hurel Dubois UK Ltd.*, 326 F.3d 1333, 1340 (11th Cir. 2003).

36

Moreover, the *Daubert* inquiry is inherently a "flexible one" and district courts "have substantial discretion in deciding how to test the expert's reliability. . . ." *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999) (citing *Daubert*, 509 U.S. at 594, 113 S. Ct. at 2797).

To fulfill their obligations under the *Daubert* standard, the district court engages in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his opinion is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact through the application of scientific, technical, or specialized expertise to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems. Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

## B.  Dr. Bromwell's Methodology Met the *Daubert* Test of Reliability

TBW's Brief conveys an incomplete and false picture of Dr. Bromwell's testimony and the bases of his opinions. It attempts to convey the impression that Dr. Bromwell's testimony is based solely upon the Law test data. On the contrary, Dr. Bromwell employed a methodology that considered numerous sources of data to determine the cause of the unexpected cracking. In addition, he brought to bear specialized knowledge based on decades of experience in the field. To assess the

reliability of the testimony it is necessary to consider, as the District Court did, *all* of the data that Dr. Bromwell employed in forming his opinions.

### 1. Dr. Bromwell's Opinion That the Cracking Was Not Caused by Excess Pore Pressure Was Amply Supported

Dr. Bromwell's extensive testimony was directed at both TBW's and HDR's theories of causation. He explained why TBW's excess pore pressure theory was unlikely to have caused cracking in the Reservoir, and why the cracking was actually caused by collapse upon wetting as HDR contended. None of TBW's criticisms relate to Dr. Bromwell's opinion that pore pressure did *not* cause the cracking. That opinion was supported by an ample foundation rooted in the facts. In this regard, his testimony put before the jury competing expert opinion from which the jurors could choose.

First, Dr. Bromwell explained that the unexpected cracking was *localized* in the northeast and southwest corners of the Reservoir. If the cracking was caused by pore pressure, as TBW contended, the significant cracking would have been experienced throughout the Reservoir. (Dkt. 317-1, pp. 19-20; Dkt. 719, p. 123, 220).

Second, the *timing* of the cracking is inconsistent with TBW's pore pressure theory. No unexpected cracking occurred during the Reservoir's first draw-down

cycle, which would have been expected if pore pressure was the culprit. (Dkt. 317-1, pp. 19-20; Dkt. 719, pp. 124-25, 219).

Third, the *location* of the cracking on the embankment slope is not consistent with the pore pressure theory. The greatest amount of pressure should have been experienced on the lower parts of the slope, but this is not where the substantial cracking occurred. (Dkt. 719, pp. 125-27).

Fourth, the *repair* of the cracks involved the insertions of substantial amounts of grout into voids at the northeast and southwest corners of the reservoir. If TBW's theory were correct, the soil that formerly occupied the voids would have had to have gone somewhere, such as moving down the embankment or eroding into the Reservoir. As there is no physical evidence of such movement or erosion, the pore pressure theory cannot explain the excessive cracking. (Dkt. 317-1, pp. 6-7, 21-21; Dkt. 719, pp. 187-89, 208-09, 221-22; Dkt. 721, pp. 132-33).

Fifth, *pressure measurements*, using devices known as piezometers, did not indicate that water pressure was greatest in the parts of the wedge closest to and immediately beneath the soil cement, as would be required to push up the soil cement under TBW's pore pressure theory. (Dkt. 719, p. 131, 221).

Hence, Dr. Bromwell's opinion that excess pore pressure was *not* the cause of the excess cracking was well-supported. TBW has not assailed his explanation

of the flaws in the pore pressure theory. As that was the sole theory offered by TBW to suggest why HDR was to blame for the cracking, Dr. Bromwell's unchallenged testimony refuting TBW's theory is sufficient in itself to sustain the jury's verdict.

### 2. Bromwell's Opinion That the Cracking Was Caused by collapse upon wetting Was Amply Supported

Dr. Bromwell's affirmative opinion that collapse upon wetting was the cause of the excess cracking is fully supported by numerous factors, even if the Law test data were totally disregarded.

First, Dr. Bromwell painstakingly reviewed *weather data,* comparing it with the daily construction records to determine the conditions when the protective layer was placed in the areas of the northeast quadrant where the unusual cracking occurred. The data indicated that the weather was unusually dry when the protective layer was being placed on the geomembrane in that area. The absence of construction records indicating the use of water trucks, coupled with construction reports, and photographic evidence of dusty conditions prevailing at the time, supports his opinion that the soil used for the protective layer was dry. (Dkt. 317-1, pp. 8-9; Dkt. 719, pp. 138-146, 156).

Second, *photographic evidence* indicates that the soil used for the protective layer was applied much thicker than the two to three feet agreed upon and as much

40

as eight feet thick in some cases. Dr. Bromwell relied on a photogeometric analysis that permitted a measurement of the soil thickness by comparison to known dimensions such as the height of a pickup truck shown in the photograph and other references. (Dkt. 317-1, pp. 8-9; Dkt. 719, pp. 150-160, 164-178, 185-87).

Third, *scientific literature* confirms the capacity of soils of the type used in the embankment to collapse upon saturation. (Dkt. 317-1, p. 4; Dkt. 721, p. 120).

Fourth, Bromwell's opinion was *confirmed* by an *independent analysis* performed by a highly qualified engineer, Dr. Jane Walbancke (an employee of TBW's own consultant), who suggested upon her own review of photographs that collapse upon wetting would explain the damage at the Reservoir. (Dkt 719, pp. 151-53).

Fifth, Dr. Bromwell supported his opinion by *TBW's repair records*, which showed large amounts of cement grout required to fill voids in the Reservoir embankment and the direction of the grout's distribution upon injection. The limited area in the northeast quadrant where the unexpected cracking was most significant received about 90% of all of the grout—some 35,000 cubic feet (approximately 116 dump truck loads). The grout was widely distributed, indicating a larger collapse area consistent with the protective layer being placed too thick, too dry, and too loose. (Dkt. 317-1, pp. 6-7, 21-22; Dkt. 719, pp. 187-89, 221-22).

The areas of unexpected cracking in the southwest corner were caused by the collapse of improperly compacted soils that had been backfilled into erosion gullies. This was corroborated by the smaller quantity of grout required to fill voids in this area, as well as the vertical orientation of the voids, which was consistent with backfilled erosion gullies. (Dkt. 719, pp. 195-204).

Sixth, as a result of his *extensive experience*, Bromwell was aware of the propensity of the type of soils used in the embankment to collapse upon saturation. (Dkt. 317-1, p. 4).

In short, Bromwell's opinion was based on numerous factors completely independent of the Law testing. The record establishes that the Law testing formed only a miniscule part of his direct examination, and was limited to the general concept that the soils used in the embankment were susceptible to collapse upon wetting. As the District Court observed, TBW failed to show why weather photographs or similar data was unreliable or inadequate to support Dr. Bromwell's conclusions (Dkt. 483, p. 3).

### C.    Dr. Bromwell's Testimony Used Reliable Extrapolation from the Law Testing Data

TBW contends that the testing methods employed in the Law testing indicate the change in volume due to saturation and loading, but do not quantify the change in volume due to saturation alone. This criticism does not undermine

Dr. Bromwell's ultimate opinion that the excessive cracking was caused by collapse upon wetting. Dr. Bromwell did not attempt to quantify the precise degree of volume change due to saturation in formulating his report. Only after he was challenged on the issue at his deposition, did he perform such calculations in advance of the *Daubert* hearing. (Dkt. 458, pp. 37-41).

Nothing in the record indicates that a calculation of the change in volume due to saturation alone is necessary to support the collapse-upon-wetting theory put forward by HDR. After all, the *fact* of collapse is amply demonstrated by the physical conditions at the Reservoir. Voids, which required filling with 35,000 cubic feet of grout appeared beneath the soil, cement. The soil that formerly occupied the voids had to go somewhere, and evidence indicated it did not fall into the Reservoir or move down the slope. Collapse *happened*.

In light of the facts on the ground, it is unsurprising that the Law test data does not form the only—or even a significant part—of the basis for Dr. Bromwell's opinion. (It is mentioned on less than three pages of his direct examination). The calculations that TBW attempts to criticize were never mentioned during Dr. Bromwell's direct testimony.

In any event, Dr. Bromwell's extrapolations from the Law test data were reliable for purposes of *Daubert*. Although a single test does not permit the quantification of the isolated effect of saturation, Dr. Bromwell had seventeen tests

43

evaluating the effect of different loading conditions on soil volume. This enabled Dr. Bromwell to determine that the amount of volume change attributable to loading was not significant. The remaining amount of volume change was due to saturation. (Dkt. 321, p. 17-18). Dr. Bromwell explained his approach at length in his deposition testimony and upon cross-examination in trial. TBW labels this approach as "ipse dixit." Yet, it fails to show why the mathematical approach employed by Dr. Bromwell would not lead to accurate results.

In contrast, the *ipse dixit* condemned by *General Electric v. Joiner* and its progeny refer to situations where the data cited by the expert do not logically support the conclusion reached by the expert. Here, Dr. Bromwell took test data, the validity of which is not questioned, and applied a mathematical formula to obtain a result. As the District Court recognized, Dr. Bromwell "showed his work." Dr. Bromwell did not rely on some subjective factor and then proclaim, based solely on his credentials, that the factor supported his conclusion. Arithmetic is not *ipse dixit*. *See City of Tuscaloosa,* 158 F.3d at 565-66 (statistician's use of calculations and multiple regression analysis constituted reliable methodology in antitrust case).

Additionally, TBW's Brief paints a false picture of the Record. Its motion to exclude Dr. Bromwell was not, as it suggests, unopposed, and the assertions of TBW's expert were not unrefuted. The District Court had before it not only

44

Dr. Bromwell's report which explained his methodology in detail, but also testimony from Dr. Bromwell's deposition addressing these issues as well as additional information provided at the *Daubert* hearing. (Dkt. 317-1, 317-6, pp. 1026-29, 458).

Not surprisingly, TBW's own retained expert disagreed with the approach taken by Dr. Bromwell. Ultimately, a disagreement between experts about methodology provides no basis to exclude the testimony of one the experts. That is a matter for the trier of fact to resolve at trial, *Quiet-Tech*, 326 F.3d at 1341-42, and TBW has not shown that the District Court abused its discretion in letting the jury resolve the disagreement among the experts.

TBW's criticism of Dr. Bromwell is strikingly similar to that rejected by this Court in *Quiet-Tech*. In *Quiet-Tech*, plaintiff's expert had performed a computational fluid dynamic (CFD) study of the effect of the defendant's after-market noise suppression device upon aircraft performance. Defendant did not challenge the reliability of CFD in general but did criticize how the expert conducted the analysis including accusations that the expert had used improper boundary conditions and had miscalculated certain values. This court held that criticisms of this nature went to the weight, not the admissibility of the evidence and were proper subjects of advocacy. *Id* at 1345-46. Here, too, TBW's criticisms

of Dr. Bromwell's calculations went to the weight of the evidence, not its admissibility.

TBW advances the curious argument that HDR's reference to Dr. Bromwell's impressive qualifications somehow provides evidence that his opinions are mere *ipse dixit*. While it certainly true that the credentials of an expert provide no substitute for a reliable methodology, it is equally true that the knowledge and experience of a witness are highly relevant in assessing that reliability. Indeed, first-hand experience in itself can provide a reliable basis for opinion testimony. One well-known case remarked that the opinion that bees always take off into the wind could be provided by a qualified aeronautics engineer, but also by a beekeeper who has observed many bees taking off. *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). Dr. Bromwell had extensive experience working with the very Florida soils used in the embankment, was thoroughly familiar with the characteristics of such soils, and had encountered situations inviting the collapse upon wetting of soils in other projects. (Dkt. 719, p. 118). Opinion testimony properly derived from experience is not *ipse dixit*.

The District Court was well within its discretion in allowing the jury to consider Dr. Bromwell's testimony.

III.   **THE DISTRICT COURT CORRECTLY DENIED LEAVE TO AMEND TO RAISE A FUTILE IMPLIED COVENANT CLAIM**

TBW complains that the District Court refused to allow it to amend its Complaint to assert that HDR had violated the covenant of good faith implicit in every contract. However, the District Court's ruling was well within its discretion, since TBW was guilty of delay in seeking the amendment, the amendment would have prejudiced HDR, and the amendment was futile since it depended entirely upon proof that HDR had violated an express term of the contract.

## A.   The District Court Applied the Correct Standard

TBW accuses the District Court of applying the incorrect legal standard to its Motion to Amend. The record does not sustain this assertion. The District Court expressly referred to Rule 15(a)(2) and its mandate that leave to amend should be freely granted when justice so requires. (Dkt. 383, p. 2). Although the District Court observed that a more stringent standard applied after the expiration of the pleading amendment deadline set forth in a scheduling order, there is no indication that it applied the more stringent standard. The court was careful to note that, even under Rule 15(a), it retained discretion to deny the motion if the plaintiff unduly delayed in seeking the amendment. (Dkt. 383, p. 2, n.1, *citing* 3 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 15,14[1] and *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 953 (9th Cir. 2006)).

47

The record reflects that the District Court gave careful consideration to the rights of the parties in determining TBW's Motion for Leave to Amend. Indeed, it granted leave for TBW to assert a substantially revised Count I over HDR's strenuous objection. (Dkt. 383, pp. 3-10).

## B.     TBW Created Undue Prejudicial Delay

The District Court found that TBW had unduly delayed in asserting claims related to HDR's investigation of the cracking. HDR presented evidence that TBW had expressed dissatisfaction with HDR's investigation well before suit was filed. (Dkt. 383, pp. 11-12). This refuted TBW's contention that it had no basis to criticize the investigation until HDR's expert was deposed. The District Court also found that HDR would be prejudiced by the proposed amendment because it had not conducted discovery on the claims pertaining to the investigation of the cracking. These findings alone, not attacked in TBW's Brief, are sufficient to sustain the denial of TBW's motion.

## C.     The Proposed Covenant of Good Faith Claim Was Properly Regarded as Futile

The proposed Count VII in the Second Amended Complaint criticized aspects of HDR's investigation into the cracking at the Reservoir. It did not, however, tie these criticisms to any particular contractual duty in the contract. Specifically, it did not identify any provision of the contract granting HDR

discretion, which, pursuant to the covenant, it would be obligated to exercise in good faith. Nor did it identify any gap in the contract terms that required HDR to act in good faith.

The proposed Count purported to state a valid, independent claim for breach of the implied covenant of good faith and fair dealing, but failed to do so. The purpose of the implied covenant is to protect the reasonable expectations of the contracting parties. *Three Keys, Ltd. v. Kennedy Funding Inc.*, 28 So.3d 894, 903 (Fla. 5th DCA 2009). Hence, it attaches to the performance of a specific contractual provision. A duty of good faith "must be anchored to the performance of an express contractual obligation." *Flagship Resort Dev. Corp. v. Interval Int'l Inc.*, 28 So.3d 915, 924 (Fla. 3d DCA 2010). "There can be no cause of action for a breach of an implied covenant absent an allegation that an express term of the term of the contract has been breached." *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So.2d 787, 792 (Fla. 2d DCA 2005).

A duty of good faith is not an abstract, independent term of the parties' contract. *Beach St. Bikes, Inc. v. Bourgett's Bike Works, Inc.*, 900 So.2d 697, 700 (Fla. 5th DCA 2005). The covenant cannot be asserted as a source of breach when all other terms of the contract have been fulfilled. *Meruelo v. Mark Andrew of Palm Beaches, Ltd.*, 12 So.3d 247, 250 (Fla. 4th DCA 2009); *Hosp. Corp. of Am. v. Fla. Med. Ctr. Inc.*, 710 So.2d 573, 575 (Fla. 4th DCA 1998). Ordinarily, the

covenant is raised where the particular question is not resolved by the terms of the contract or where the contract contains an express duty or obligation over which one party has sole discretion. *Meruelo*, 12 So.3d at 250; *Publix Super Markets Inc. v. Wilder Corp. of Del.*, 876 So.2d 652, 654 (Fla. 2d DCA 2004).

As the District Court noted, an implied covenant claim is properly dismissed when it is duplicative of the accompanying breach of contract action. (Dkt. 383, p. 15, *citing Arlen House East Condo Ass'n v. QBE Ins. (Europe) Ltd.*, No. 07-23199-CIV, 2008 WL 4500690 at *3 n.2 (S.D. Fla. Sept. 30, 2008); *Regency of Palm Beach, Inc. v. QBE Ins. Corp.*, No. 08-81442-CIV, 2009 WL 2729954 at *5 (S.D. Fla. Aug. 25, 2009)).

The implied covenant of good faith is not, as TBW suggests, a free-ranging invitation to the jury to assess the conduct of the parties to a contract. As the District Court correctly recognized, the contract itself established a standard of care requiring HDR to perform its work in accordance with the standard of care, skill, and diligence customarily provided by an experienced consulting organization rendering the services in accordance with sound professional principles and practices. If HDR did not breach this provision, no implied covenant could be used to create a breach, and if HDR *did* breach the provision, no resort to the implied covenant is necessary.

Moreover, the actions about which TBW complained in the proposed Count VII all related to the investigation of the cracking, not the cracking itself. No factual allegation in the Complaint indicates that TBW sustained damages as a result of HDR's investigating activities. Even if TBW had been permitted to raise the issue, it could not have resulted in a judgment in TBW's favor.

Ultimately, TBW failed to obtain a finding that HDR breached any of the express terms of the contract. Without such a breach, a claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law. *Centurion Air Cargo, Inc. v. United Parcel Serv., Co.*, 420 F.3d 1146, 1152 (11th Cir. 2005) (citing *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1097 (Fla. 1st DCA 1999).

## IV.    TBW HAS NOT DEMONSTRATED HARMFUL ERROR

Federal Rule of Civil Procedure 61, entitled "Harmless Error," provides:

> Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trail, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, at every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

FED. R. CIV. P. 61. This Court has recognized that although the Federal Rules of Civil Procedure apply only in the district courts, the policies embodied by the rules are applicable to the court of appeals when it determines whether a judgment

should be upheld. *Rosenfeld v. Oceania Cruises, Inc.*, 682 F.3d 1320, 1333 n.14 (11th Cir. 2012). Consequently, the appellant must affirmatively demonstrate that any error that occurred had a prejudicial effect. Moreover, the error must be considered in light of the course of an entire trial. *Id*. at 1333 n.15, *citing Bell v. Swift & Co.*, 283 F.2d 407, 409 (5th Cir. 1960).

Here, TBW has not and cannot meet its burden to show that any error it has raised affected its substantial rights. TBW's complaints regarding the admission of evidence concerning collapse upon wetting and the testimony of Dr. Bromwell, is directed solely to the issue of causation. TBW seemingly forgets that the jury was presented with a question which required it to consider not only whether HDR violated the standard of care but also whether any such violation was a legal cause of damages to TBW. (TBW approved this instruction). In answering the question, "No," the jury may well have determined that HDR did not violate the standard of care. Substantial evidence supports such a finding. HDR's expert, Lee Wooten, a geotechnical engineer, testified that HDR's design met the applicable standard of care and that HDR's design team gave appropriate consideration to potential uplift pressure. (Dkt. 721, pp. 150-180). TBW's appeal does not challenge this testimony in any way. If the jury accepted it—and there is no reason to believe the jury did not—the response to the question on the verdict would have still been "no," regardless of any evidence on the causation issue.

Moreover, TBW's own theory of causation was seriously undermined by the evidence: Excessive cracking was localized within the embankment; the pore pressure theory could not account for the absence of soil from the areas in which voids had appeared; the timing and location of the cracking was inconsistent with the pore pressure theory; the piezometer readings were also inconsistent with that theory. The jury could well have concluded that TBW failed to meet its burden of proof without considering any of the evidence about which HDR complains.

In short, even if this Court were to conclude that the District Court abused its discretion in any of the three rulings of which TBW complains, the error was harmless when the 19-day trial proceeding is considered as a whole.

# CONCLUSION

The judgment of the District Court should be affirmed in all respects.

Respectfully submitted,

<u>s/ S. Vance Wittie</u>
**S. Vance Wittie**
Texas Bar No. 21832980
Wayne B. Mason
Texas Bar No. 13158950
Sedgwick LLP
1717 Main Street, Suite 5400
Dallas, TX 75201-7367
Telephone: (469) 227-8200
Email: vance.wittie@sedgwicklaw.com
Email: wayne.mason@sedgwicklaw.com

**Arthur J. England, Jr.**
Florida Bar No. 022730
1825 Ponce de Leon Boulevard #512
Coral Gables, FL 33134
Telephone: (305) 967-8489
Email: Arthur@arthurenglandlaw.com

**Timothy D. Woodward**
Florida Bar No. 0486868
Forizs & Dogali, P.A.
4301 Anchor Plaza Parkway, Ste. 300
Tampa, FL 33634
Telephone: (813) 289-0700
Email: twoodward@forizs-dogali.com

*Attorneys for Appellee*

54

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 11,858 words.

*s/ S. Vance Wittie*

**S. Vance Wittie**
Texas Bar No. 21832980

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 13th day of May, 2013, I electronically filed the foregoing document via the U.S. Court of Appeals CM/ECF system and also served via email to the following:

Richard A. Harrison
Law Offices of Richard A. Harrison, P.A.
400 N. Ashley Dr., Suite 2600
Tampa, FL 33602
Email: rah@harrisonpa.com

Cynthia S. Tunnicliff
Pennington & Haben, PA
215 S Monroe St Fl 2
Tallahassee, FL 32301-1839
Email: cynthia@penningtonlaw.com

*s/ S. Vance Wittie*
**S. Vance Wittie**
Texas Bar No. 21832980